WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


JEANETTE LEE PLACE,                         )
                                            )
                          Plaintiff,        )
                                            )
         vs.                                )
                                            )
ANDREW SAUL, Commissioner of Social         )
Security,                                   )
                                            )          No. 1:19-cv-0008-HRH
                          Defendant.        )
_____)


O R D E R

This is an action for judicial review of the denial of disability benefits under Title II

of the Social Security Act, 42 U.S.C. §§ 401-434.  Plaintiff Jeanette Lee Place has timely

filed her opening brief,[1] to which defendant, Andrew Saul, has timely responded.[2]  Oral

argument was not requested and is not deemed necessary.

Procedural Background

On June 1, 2013, plaintiff filed an application for disability benefits under Title II of

the Social Security Act, alleging that she became disabled on January 31, 2013.  Plaintiff

_____

[1]Docket No. 15.

[2]Docket No. 16.

-1-

alleged that she was disabled due to PTSD, anxiety, mood disorder, physical disabilities, spondylolisthesis, osteoarthritis, and shoulder deterioration. Plaintiff's application was denied initially. Plaintiff requested a hearing, and after administrative hearings held on August 18, 2014 and March 23, 2015, an administrative law judge (ALJ) denied plaintiff's application. Plaintiff sought review of the ALJ's June 11, 2015 unfavorable decision. On October 27, 2016, the Appeals Council denied plaintiff's request for review. Plaintiff sought judicial review and on March 20, 2018, the court remanded this matter for further proceedings. Upon remand, an administrative hearing was held on January 9, 2019. After this hearing, the ALJ again denied plaintiff's application. Plaintiff bypassed written exceptions, thereby making the ALJ's May 1, 2019 decision the final decision of the Commissioner. On July 3, 2019, plaintiff commenced this action in which she asks the court to review the Commissioner's final decision.

## General Background

Plaintiff was born on September 29, 1966. Plaintiff was 46 years old on her alleged onset date, 47 years old at the time of the first administrative hearing, 48 years old at the time of the second administrative hearing, and 52 years of age at the time of the third administrative hearing. Plaintiff has a GED. Plaintiff's past relevant work was as a cashier, a stocker, and a certified nursing assistant.

## The ALJ's Decision

The ALJ first found that plaintiff "last met the insured status requirements of the

Social Security Act on March 31, 2017."[3]

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[4]

At step one, the ALJ found that plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of January 31, 2013 through her date last insured of March 31, 2017. . . ."[5]

At step two, the ALJ found that "[t]hrough the date last insured, the claimant had the

---

[3]Admin. Rec. at 852.

[4]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
> Step two: Is the claimant's alleged impairment sufficiently severe to limit . . . her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform . . . her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow . . . her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[5]Admin. Rec. at 853.

following severe impairments: cervical spondylosis, degenerative disc disease of the lumbar spine, fibromyalgia, obesity, an anxiety disorder, a depressive disorder, and posttraumatic stress disorder (PTSD). . . ."[6]

At step three, the ALJ found that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. . . ."[7] The ALJ gave great weight to Dr. Gaeta's opinion "that the medical evidence of record does not support a finding of listing-level severity of any physical impairment or combination thereof."[8] The ALJ gave great weight to Dr. Lace's opinion that plaintiff "had only mild limitations [in] terms of the cognitive functioning prongs of the 'paragraph B' criteria, and at most moderate limitations in terms of the remaining 'paragraph B' criteria of interacting with others and adapting or managing oneself."[9]

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC." Bray v. Comm'r of Social Security Admin., 554 F.3d 1219, 1222–23 (9th Cir. 2009). The ALJ found that

> through the date last insured, the claimant had the residual
> functional capacity to perform light work as defined in 20 CFR

---

[6]Admin. Rec. at 853.

[7]Admin. Rec. at 853-854.

[8]Admin. Rec. at 854.

[9]Admin. Rec. at 854.

404.1567(b) except that she could frequently climb ramps or stairs; never climb ladders, ropes or scaffolds; and occasionally stoop, kneel, crouch, and crawl. She should . . . avoid[] all unprotected heights and hazardous machinery. In addition, the claimant's work should [be] limited to routine tasks at a single workstation with no production rate or high-speed paced work, as well as only occasional interaction with the public, co-workers and supervisors.[10]

The ALJ gave great weight[11] to Dr. Gaeta's opinion[12] and Dr. Lace's opinion.[13] The ALJ gave little to no weight to the opinions of Social Worker Tomkinson and FNP Brown.[14]

The ALJ gave some, but little, weight to PT Weaver's May 2013 opinion.[15] The ALJ gave

---

[10]Admin. Rec. at 855.

[11]Admin. Rec. at 861.

[12]Dr. Gaeta's opinion is discussed below in detail.

[13]Michael Lace, Psy.D., testified as a medical expert at the third administrative hearing. Dr. Lace testified that plaintiff would

be limited to occasional contact with co-workers, the general public and supervisors. She would also be limited to a single work location. . . . So, no travel. Could be in one building with different workstations within the building, but no more than a single location. And [she] would be limited . . . to routine tasks with little or no high-speed production type of tasks involved.

Admin. Rec. at 913-914.

[14]Admin. Rec. at 861. Tomkinson's and FNP Brown's opinions are discussed below in detail.

[15]Admin. Rec. at 861. PT Weaver's opinion is discussed below in detail.

some, but little weight,[16] to Dr. Brogdon's May 2013 opinion.[17]  The ALJ gave some weight[18]

to Dr. Caldwell's opinion.[19]  The ALJ gave some weight[20] to Dr. Winn's opinion.[21]  The ALJ

---

[16]Admin. Rec. at 861.

[17]On May 31, 2013, Dr. Brogdon noted that he and plaintiff

> talked a good bit about the patient's decision to go on disabil-ity[.] I believe that the patient has a strong case relating not only to her mental condition but also to her physical condition.  She has spondylolisthesis which produces rather severe pain in addition to chronic hip pain.  She had functional assessment from physical therapy that revealed that these conditions are both limiting her very severely in her ability to move and accomplish work-related tasks.  This coupled with the patient's continuing mood lability and posttraumatic stress is a severe hindrance that I think would make it impossible for the patient to support herself financially by working[. I]n this situation, disability makes the most sense as far as the way to have her continue to be supported and allow some quality of life.

Admin. Rec. at 343.

[18]Admin. Rec. at 862.

[19]On January 4, 2014, Jay Caldwell, M.D., opined that plaintiff could occasionally lift/carry 35 pounds; frequently lift/carry 10 pounds; stand/walk for 6 hours; sit for 6 hours; was unlimited as to push/pull; could frequently crouch; could occasionally climb lad-ders/scaffolds and stoop; had no limitations as to climbing ramps/stairs, balancing, kneeling, and crawling; was limited as to reaching overhead; had no limitations as to handling, fingering, and feeling; and should avoid moderate exposure to vibration.  Admin. Rec. at 433-436.

[20]Admin. Rec. at 862.

[21]On February 27, 2014, Dr. Winn opined that plaintiff was not significantly limited as to her ability to remember locations and work-like procedures, understand/remember/carry out short and simple instructions, perform activities within a schedule, maintain regular
(continued...)

gave some, but little weight,[22] to the April 2014 opinion of Dr. Kemper.[23]  The ALJ gave

some, but little weight,[24] to Social Worker Weyhmiller's June 2014 opinion.[25]  The ALJ gave

---

[21](...continued)
attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, be aware of hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; and was moderately limited in her ability to understand/remember/ carry out detailed instructions, maintain concentration and attention for extended periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Admin. Rec. at 116-117.  Dr. Winn explained that plaintiff "has the ability to understand, retain and follow instructions and sustain attention to perform simple tasks[,]" that her "[c]oncentration, persistence and pace will be decreased by anxiety and depressive sxs[,]" that she could "manage occasional contacts with the public [and] accept supervision delivered in a reassuring manner[,]" and would "be able to adapt to changes in the work environment, but may be resistant to the changes initially."  Admin. Rec. at 116-117.

[22]Admin. Rec. at 863.

[23]On April 25, 2014, Dr. Kemper wrote a note excusing plaintiff from jury duty because "[s]he has Agoraphobia with Panic Disorder that interferes with her ability to function under stress. . . ."  Admin. Rec. at 539.

[24]Admin. Rec. at 863.

[25]In June 2014, Weyhmiller noted that both plaintiff's "physical and emotional pain are impacting her daily functioning on several levels."  Admin. Rec. at 665.

some weight[26] to plaintiff's GAF scores.[27]   The ALJ considered the lay testimony[28] of plaintiff's husband,[29] Glenda Halvorsen,[30] and Zachary Kelly.[31]

The ALJ found plaintiff's pain and symptom statements less than credible because they were not consistent with the objective medical evidence and because they were not consisted with her reported daily activities, which the ALJ found were "suggestive of improved functioning over the course of the longitudinal period at issue."[32]

At step four, the ALJ found that "[t]hrough the date last insured, the claimant was unable to perform any past relevant work. . . ."[33]

At step five, the ALJ found that "[t]hrough the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have

---

[26]Admin. Rec. at 864.

[27]On May 31, 2013, plaintiff's GAF score was 50-60.  Admin. Rec. at 344.  On June 28, 2013, plaintiff's GAF score was 60-70.  Admin. Rec. at 342.  On July 25, 2013, plaintiff's GAF score was 55-60.  Admin. Rec. at 347.  On September 29, 2014, plaintiff's GAF score was 55.  Admin. Rec. at 802.

[28]Admin. Rec. at 864.

[29]Ronald Place, plaintiff's husband, completed function reports on August 28, 2013 and September 5, 2014.  Admin. Rec. at 226-234; 285-287.

[30]Admin. Rec. at 278.

[31]Admin. Rec. at 279.

[32]Admin. Rec. at 860-861.

[33]Admin. Rec. at 864.

performed[,]" including working as a bottle packer, a routing clerk, or a marker.[34]  This

finding was based[35] on the interrogatories the ALJ put to Raymond North, a vocational

expert.[36]

Thus, the ALJ concluded that plaintiff "was not under a disability, as defined in the

Social Security Act, at any time from January 31, 2013, the alleged onset date, through

March 31, 2017, the date last insured. . . ."[37]

## Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of

the Commissioner. . . ."  The court "properly affirms the Commissioner's decision denying

benefits if it is supported by substantial evidence and based on the application of correct legal

standards." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).  "Substantial evidence

is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Andrews

v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  "'To determine whether substantial evidence

supports the ALJ's decision, [the court] review[s] the administrative record as a whole,

---

[34]Admin. Rec. at 865-866.

[35]Admin. Rec. at 865-866.

[36]Admin. Rec. at 1172-1176.

[37]Admin. Rec. at 866.

weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Id. (quoting Andrews, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. Id. But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)).

## Discussion

Plaintiff's first argues that the ALJ's physical RFC was flawed. The ALJ found that plaintiff "had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could frequently climb ramps or stairs; never climb ladders, ropes or scaffolds; and occasionally stoop, kneel, crouch, and crawl. She should . . . avoid[] all unprotected heights and hazardous machinery."[38] These were the physical limitations opined to by Dr. Gaeta,[39] a medical expert who testified at the third administrative hearing.

Plaintiff argues that Dr. Gaeta's opinion cannot constitute substantial evidence in support of the ALJ's RFC because Dr. Gaeta did not review the entire medical record but instead relied only on the one examination done by Dr. Trimble, a neurologist who examined plaintiff on July 14, 2014.[40] Plaintiff argues that one examination which found that she was

---

[38]Admin. Rec. at 855.

[39]Admin. Rec. at 886-887.

[40]Admin. Rec. at 667-668.

neurologically intact is not substantial evidence contradicting all the other medical records that showed that she had limited range of motion, pain, and abnormal sensations.[41]

To the extent that plaintiff is contending that Dr. Gaeta only relied on Dr. Trimble's neurological exam, that contention is wrong. Dr. Gaeta testified that he found that exam to be the "most thorough exam" and that he gave that exam "more weight" than a physical therapy evaluation.[42] But he did not testify that this exam was the only medical evidence he relied on or considered. Rather, he testified that he "put a lot of weight on" the July 14, 2014 neurological examination[43] and that he reviewed all the medical evidence in the record.[44]

Plaintiff also argues that the ALJ's reliance on Dr. Gaeta's opinion was misplaced because Dr. Gaeta acknowledged that he had not read or considered all of the treatment notes. This is based on an exchange between Dr. Gaeta and plaintiff's lawyer during the third administrative hearing. The attorney asked Dr. Gaeta whether "a person with the [c]laimant's neck impairment of cervical spondylosis [would] have difficulty with range of motion of the neck and movements of the neck[.]"[45] Dr. Gaeta testified that he did not "know whether that was described anywhere, with limitation of motion[], but that can happen,

---

[41]Admin. Rec. at 306-307, 331, 574, 585, 590-591, 817, 821, 829, 832-833, 839, 1182-1183, 1192, 1200, 1204, 1329.

[42]Admin. Rec. at 888-889.

[43]Admin. Rec. at 888.

[44]Admin. Rec. at 884.

[45]Admin. Rec. at 893.

yes."[46]  Plaintiff contends that there is evidence in the record that she had limited motion in her neck and thus it is clear that Dr. Gaeta did not do a comprehensive review of the medical record, as the ALJ found.[47]  In short, plaintiff contends that Dr. Gaeta failed to consider or ignored some of the medical evidence as it related to her cervical spondylosis.

Dr. Gaeta testified that he did not see any evidence in the record that plaintiff had limited motion in her neck due to this impairment.  There were, however, a number of medical records which indicated that plaintiff's cervical range of motion was limited.  On May 29, 2013, on exam by PT Weaver, plaintiff's cervical range of motion was as follows: "1. Flexion: chin 2" from chest[.]  2.  Extension: 0 to 40 degrees[.]  3.  Rotation: right and left 0 to 50 degrees."[48]  On April 28, 2014, at her physical therapy appointment, plaintiff's cervical range of motion was as follows: "1.  Forward Flexion: chin 2" from chest.  2.  Extension: neutral[.]  3.  Rotation: right to 40 degrees, and left to 50 degrees.  All motions are limited by pain."[49]  On June 12, 2014, on exam by PT Weaver, plaintiff's cervical range of motion was as follows: "1.  Forward Flexion: chin 1" from chest.  2.  Extension: 0 to 40 degrees.  3.  Rotation: right and left to 65 degrees."[50]  On May 21, 2014, on exam by PT

---

[46]Admin. Rec. at 893.

[47]Admin. Rec. at 857.

[48]Admin. Rec. at 306.

[49]Admin. Rec. at 574.

[50]Admin. Rec. at 585.

Weaver, plaintiff's cervical range of motion was as follows: "1. Forward Flexion: chin 1" from chest. 2. Extension: 0 to 40 degrees. 3. Rotation: right and left 0 to 65 degrees."[51] On August 12, 2014, on exam by PT Weaver, plaintiff's cervical range of motion was as follows: "1. Flexion: chin 2" from chest[.] 2. Extension: 0 to 40 degrees[.] 3. Rotation: right to 60 degrees, and left to 40 degrees."[52] Weaver also noted that "[a]ll motions limited due to muscle tightness and pain at end range."[53] On September 4, 2014, on exam by PT Weaver, plaintiff's cervical range of motion was as follows: "1. Forward Flexion: chin 2" from chest[.] 2. Extension: 0 to 30 degrees[.] 3. Rotation: right and left 40 degrees with pain most pronounced to the right."[54] On January 23, 2015, on exam by PT Weaver, plaintiff's cervical range of motion was as follows: "1. Forward Flexion: chin 2" from chest. 2. Extension: 25 degrees[.] 3. Rotation: right to 60 degrees left to 50 degrees. 4. Side Bend: right to 30 degrees; left to 20 degrees. All motions limited due to pain at end range."[55] On February 6, 2015, on exam by Dr. Kemper, plaintiff's neck had "reduced ROM in all directions[.]"[56] On June 10, 2015, on exam by PT Weaver, plaintiff's "C-spine AROM [was]

---

[51]Admin. Rec. at 591.

[52]Admin. Rec. at 817.

[53]Admin. Rec. at 817.

[54]Admin. Rec. at 821.

[55]Admin. Rec. at 832.

[56]Admin. Rec. at 839.

limited by 30-40% throughout due to pain and guarding."[57]  On July 20, 2015, on exam by PT Weaver, plaintiff's cervical range of motion was as follows:  "1.  Forward Flexion: chin 1" from chest.  2.  Extension: 30 degrees[.]  3.  Rotation: right to 60 degrees; left to 60 degrees.  4.  Side Bend:  right to 20 degrees; left to 20 degrees.  All motions are guarded and limited at end range from pain and muscle tightness."[58]  On September 10, 2015, on exam by PT Weaver, plaintiff's cervical range of motion was as follows:  "1.  Forward Flexion: chin to chest.  2.  Extension: 60 degrees[.]  3.  Rotation: right to 70 degrees; left to 30 degrees.  4.  Side Bend: right to 30 degrees; left to 30 degrees.  All motions are guarded and limited at end range from pain and muscle tightness."[59]  On November 24, 2015, on exam by PT Weaver, plaintiff's cervical range of motion was as follows:  "1.  Forward Flexion: chin 1" from chest.  2.  Extension: 40 degrees[.]  3.  Rotation: right to 60 degrees;  left to 50 degrees.  All motions are limited at the end range from pain and muscle tightness."[60]  On April 12, 2018, on exam by PA Frazier, plaintiff's neck range of motion was "limited to full flexion and lateral bending[.]"[61]  This evidence[62] shows that plaintiff had limited range of

---

[57]Admin. Rec. at 1204.

[58]Admin. Rec. at 1200.

[59]Admin. Rec. at 1192.

[60]Admin. Rec. at 1182-1183.

[61]Admin. Rec. at 1329.

[62]Although much of this evidence was from PT Weaver, who at the time in question
(continued...)

-14-

motion in her neck throughout the relevant time period. Yet, both Dr. Gaeta and the ALJ appeared to have ignored this evidence.

The ALJ explained that she was not including any limitations related to plaintiff's cervical spondylosis because there was "evidence of normal functioning of [plaintiff's] upper extremities despite her cervical spondylosis such that there is no evidence of radiculopathy caused by this impairment."[63] This was based on Dr. Gaeta's testimony that plaintiff retained normal functioning in her arms, did not have radiculopathy and that her imaging did not show any nerve impingement or displacement, all of which was correct. But this says nothing about the evidence that plaintiff had reduced range of motion in her neck. As set out above, there is substantial evidence in the record that plaintiff had limitations flowing from her cervical spondylosis, but the ALJ, based on Dr. Gaeta's testimony, did not include any such limitations. "[A]n ALJ is not free to disregard properly supported limitations." Robbins v. Social Sec. Admin., 466 F.3d 880, 886 (9th Cir. 2006). Yet, that is what the ALJ did here. Thus, the ALJ's physical RFC was flawed, which means that the hypothetical the ALJ gave to North, the vocational expert, was incomplete. And "[i]f a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." Hill

---

[62](...continued)
would not have been considered an "acceptable medical source", this is still evidence that the ALJ should have considered in evaluating the severity of plaintiff's cervical spondylosis impairment and how it affected her ability to work. 20 C.F.R. § 404.1513(d)(1) (2013).

[63]Admin. Rec. at 857.

v. Astrue, 698 F.3d 1153, 1162 (9th Cir. 2012) (citation omitted).  Thus, the ALJ's step five finding was not supported by substantial evidence.

Plaintiff next argues that the ALJ erred in rejecting FNP Brown's opinions.  On November 9, 2018, FNP Brown opined that plaintiff could sit for less than 2 hours; could stand/walk for less than 2 hours; would need to take unscheduled breaks, up to 4 per hour; needed to use a cane or other assistive device for occasional standing/walking; could rarely lift less than 10 pounds; could rarely look down or up or turn head left to right; could occasionally hold her head in static position; could rarely twist; could never stoop/bend, crouch/squat, or climb ladders; could rarely climb stairs; could occasionally use her hands for grasping; and could rarely do fine manipulation or reach overhead.[64]  Brown also opined that plaintiff was seriously limited but not precluded in her ability to remember work-like procedures, maintain attention for a 2-hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal work-day and workweek without interruptions from psychologically based symptoms, respond appropri- ately to changes in a routine work setting, deal with normal work stress, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation; and was unable able to meet competitive standards as to working in coordination with or proximity to others without being unduly distracted and performing at a consistent pace without an

---

[64]Admin. Rec. at 1351-1352.

unreasonable number and length of rest periods.[65]  Brown also opined that plaintiff would

be off task more than 20% of the time and that she would miss more than four days of work

per month.[66]

FNP Brown was a treating source.[67]  "As a general rule, more weight should be given

to the opinion of a treating source than to the opinion of doctors who do not treat the

claimant."  <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995).  "[I]f the treating doctor's

opinion is contradicted by another doctor, the Commissioner may not reject this opinion

without providing 'specific and legitimate reasons' supported by substantial evidence in the

record for so doing."  <u>Id.</u> (quoting <u>Murray v. Heckler</u>, 722 F.2d 499, 502 (9th Cir. 1983)).

FNP Brown's opinions were contradicted by Dr. Gaeta's and Dr. Lace's opinions; and so,

the ALJ was required to give specific and legitimate reasons for rejecting FNP Brown's

opinions.

The ALJ gave no weight to the opinions of FNP Brown because they were "dated over

a year [and a] half after the date last insured of March 31, 2017" and thus "they do not

---

[65]Admin. Rec. at 1353.

[66]Admin. Rec. at 1354.

[67]Under the regulations applicable to plaintiff's application, "evidence from an acceptable medical source is distinguished from evidence from a non-acceptable medical source."  <u>Hale v. Berryhill</u>, Case No. 3:17-cv-00697-HZ, 2018 WL 2221675, at *9 (D. Or. May 15, 2018).  FNP Brown was an acceptable medical source because his medical source statement was signed by Dr. Rodney Schaffer, Brown's supervising physician.  Admin. Rec. at 1355.  <u>See</u> <u>Taylor v. Comm'r of Social Sec. Admin.</u>, 659 F.3d 1228, 1234 (9th Cir. 2011).

reasonably relate to, and are . . . likewise largely irrelevant to, the claimant's functioning during the period at issue. . . ."[68]  Plaintiff argues that this was not a legitimate reason for rejecting FNP Brown's opinions.  Plaintiff acknowledges that FNP Brown's opinions were dated after the date last insured, but she argues that this was not a reason to reject the opinions because FNP Brown was in the same office that had treated her throughout the relevant period.  Thus, she contends that FNP Brown would have had access to her medical records.  Plaintiff also argues that the date of the opinions was not a legitimate reason because FNP Brown stated that plaintiff's functional limitations had begun in 2010,[69] which she contends means that FNP Brown's opinions were relevant to the period at issue, even though they were dated after her date last insured.

The ALJ erred as to FNP Brown's opinions.  In the Ninth Circuit, "although there may be a thumb on the scale in favor of opinions flowing from contemporaneous exams, an ALJ still must carefully consider retrospectively-rendered opinions and can't disregard them based solely on when they were rendered."  <u>Barker v. Comm'r of Social Sec. Admin.</u>, Case No. CV-18-08136-PCT-DWL, 2019 WL 3718975, at *5 (D. Ariz. Aug. 7, 2019) (reconciling <u>Smith v. Bowen</u>, 849 F.2d 1222 (9th Cir. 1988) with <u>Macri v. Chater</u>, 93 F.3d 540 (9th Cir. 1996).  Here, the ALJ did not carefully consider FNP Brown's opinions.  Rather, the ALJ disregarded his opinions solely based on when they were rendered.

---

[68]Admin. Rec. at 861.

[69]Admin. Rec. at 1355.

Plaintiff next argues that the ALJ erred in rejecting PT Weaver's opinion. On May 29, 2013, Weaver noted that plaintiff's "chronic pain [is] complicated by degenerative changes as identified by MRI, deconditioning (48% of reference), morbid obesity and depression. The patient's current functional limitations would prevent gainful employment at this time."[70]

Plaintiff argues that the ALJ stated that Weaver's opinion was simply that she could not work and that this was not a proper summary of Weaver's opinion. Plaintiff argues that the ALJ ignored Weaver's opinion that she was deconditioned by 48%.

The ALJ did not err as to her summary of Weaver's opinion. Weaver basically opined that plaintiff could not work and the ALJ stated that Weaver "opined that the claimant's functional limitations prevented gainful employment. . . ."[71] This was an adequate summary of Weaver's opinion.

Finally, plaintiff argues that the ALJ erred as to Social Worker Tomkinson's opinion. On December 12, 2018, Tomkinson opined that plaintiff had limited but satisfactory abilities to maintain regular attendance, be punctual within customary, usually strict tolerances, ask simple questions or request assistance, interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and use public transportation; had seriously limited, but not precluded abilities to

---

[70]Admin. Rec. at 616.

[71]Admin. Rec. at 861.

understand/remember/carry out short and simple instructions, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places; and would be unable to meet competitive standards as to remembering work-like procedures, maintaining attention for two hours, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, and dealing with normal work stress.[72] Tomkinson also opined that plaintiff would be off task more than 20% of the time and would miss more than four days of work per month.[73]

Because Tomkinson would not be considered an acceptable medical source under the regulations that are applicable to plaintiff's application,[74] the ALJ was only required to give a germane reason for rejecting his opinion. <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir.

---

[72]Admin. Rec. at 1357.

[73]Admin. Rec. at 1358.

[74]Under the regulations applicable to plaintiff's application, "[p]ractitioners such as physician's assistants, nurse practitioners, chiropractors, audiologists, naturopathic physicians, and therapists, are 'other sources' or non-acceptable medical sources." <u>Hale</u>, 2018 WL 2221675, at *9 (citing 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (2013)).

2012).  The ALJ gave Tomkinson's opinion no weight because it was "dated over a year [and] a half after the date last insured of March 31, 2017" and thus it did "not reasonably relate to" and was "largely irrelevant to[] the claimant's functioning during the period at issue. . . ."[75]

Plaintiff argues that this was error because Tomkinson had stated that he had been working with plaintiff since January 2016 and at times saw her weekly.[76]  But, there are no treatment notes to support Tomkinson's statement.  The only note or record from Tomkinson in the record is the December 2018 opinion.  The ALJ did not err as to Tomkinson's opinion.  The ALJ gave a germane reason for rejecting Tomkinson's opinion.

If the ALJ erred, which she did, plaintiff requests that this matter be remanded for further proceedings.  A "[r]emand for further administrative proceedings is appropriate" here because "enhancement of the record would be useful."  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (emphasis omitted).

<u>Conclusion</u>

The decision of the Commissioner is reversed and this matter is remanded for further proceedings.

DATED at Anchorage, Alaska, this 14th day of January, 2020.

/s/ H. Russel Holland
United States District Judge

---

[75]Admin. Rec. at 861.

[76]Admin. Rec. at 1356.